**SEVEN STARS FARM, INC., Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (GRIFFITHS), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 14, 2007.

Decided Nov. 8, 2007.

Charles S. Katz, Jr., Philadelphia, for petitioner.

Matthew L. Wilson, Philadelphia, for respondent.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Seven Stars Farm, Inc. (Employer) appeals from an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) granting David Griffith's (Claimant) penalty petition because Employer's insurance carrier, Laundry Owners Mutual Liability Insurance Company (Carrier), failed to pay his bills for reasonable and necessary medical treatment even though they were not submitted on the proper forms.

On August 21, 2000, Claimant sustained a catastrophic work injury that made him a quadriplegic. On February 18, 2003, he filed a penalty petition alleging that Employer violated the Pennsylvania Workers' Compensation Act (Act)[1] by failing to pay for reasonable and necessary medical treatment—specifically, home health aide services for three hours per day, five days a week; and medical supplies and prescriptions which were previously determined to be reasonable and necessary pursuant to a utilization review. Claimant sought penalties and unreasonable contest attorneys' fees. Employer filed an answer denying any violation of the Act.

At the hearing before the WCJ, Moira Callahan (Callahan), Claimant's home health aide, testified that she was not a registered nurse, licensed practical nurse or a certified nurse's aide, but that she provided personal care for Claimant since August or September 2000. She helped him with feeding and dressing and matters of personal catheter hygiene, including changing his urine-filled bags. She explained the supplies that were used daily in Claimant's maintenance included overnight drainage bags, urinary tubing, foley catheters, rubber gloves and irrigation trays. Callahan stated that she also performed various household chores. She stated that she worked three hours per day Monday through Friday, but six hours every other Friday, and four hours per day on Saturday and Sunday. She was paid $12 per hour during the week and $15 per hour on the weekend by check from Employer. She stated that she logged her time and the general nature of her services each day on time sheets that she initialed on a printed form that indicated that she was a "nurse's aide," even though she was not because those forms were "on hand." She also completed additional time sheets.

Cindy Dunphy (Dunphy), Employer's bookkeeper, also testified on behalf of Claimant stating that all of Claimant's medical expenses were provided to her which she then forwarded to the Carrier approximately every 30 to 45 days for payment. Regarding the hours Callahan worked, she was aware that Callahan kept track of her hours worked on time sheets that indicated that she was a nurse's aide even though she was not so qualified. Dunphy testified that she provided payroll information to the Carrier and accurately accounted for the time and expenses associated with Callahan's work. She explained that while Callahan did work more than 15 hours at times as an aide, she only billed a maximum of 15 hours at the "aide" rate and the difference was paid by Employer. However, she admitted that the

---

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 1–1041.4; 2501–2626.

weekend work was being submitted at a "nursing" rate of $15 per hour which was higher than her weekday rate. Dunphy stated that she sent letters to Michael P. Arrigo (Arrigo), the claims representative for the Carrier, regarding the hours Callahan worked from 2/9/02 through 9/21/02 for a bill of $2,646; 9/28/02 through 11/16/02 for a bill of $1,620; 11/18/02 for a bill of $748; 11/23/02 through 12/14/02 for a bill of $960; and 3/1/03 through 5/3/03 for a bill of $1,645.25; however, she never received payment for Callahan's work. The last payment she received from the Carrier was a check dated 10/29/02 for home aide services through 9/21/02.

Regarding the pharmacy bill of Gateway Pharmacy, Dunphy stated that only some of the expenses had been paid and Claimant had paid approximately $400 for his prescriptions out-of-pocket. Similarly, regarding the bill from Home Health Care Supply for $1,337.05 and Young's Medical Equipment for $100, Dunphy testified that Claimant was being forced to purchase his own medical supplies because the Carrier would not pay the bills. There was also a bill from Lincare for $150 for setting up a Hoyer Lift for his wheelchair that was not paid and a bill from Bryn Mawr Rehabilitation for $498.20 that was not paid.

In opposition, Arrigo acknowledged that it was the Carrier's obligation to pay bills for home health services. However, he stated that he had received separate bills for "aide" and "nursing" services, and they did not disclose the specific dates the services were performed. He did not pay these bills because they were not "clean bills," i.e., they were not on a Department of Labor and Industry form accompanied by the proper Medicare form, and they did not disclose the dates of services and no payroll records were provided in support. Arrigo admitted that Callahan's bills had not been paid for approximately a year-and-a-half, although one of her bills was paid to show good faith even though it was not submitted on the proper form.

Regarding the Gateway Pharmacy bills, Arrigo explained that some of the bills had been paid and those that had not were due to missing NDC codes which were required for repricing. Nonetheless, he explained that an arrangement had been made with another company called Injured Workers Pharmacy to supply all prescriptions to Claimant. As to Home Health Care Supply, Arrigo stated that the company had not billed the Carrier directly, and an arrangement had been reached that Home Health Care Supply would refund any charges to Claimant. Arrigo testified that Claimant had advised him by letter dated July 14, 2002, that he was having difficulty obtaining both his home health care supplies and prescriptions drugs, but Arrigo did not receive that letter until March 6, 2003. Arrigo stated that he arranged for a refund to Claimant for the bill from Bryn Mawr, but a "clean bill" was not forwarded to the Carrier until after the penalty petition was filed. As for the Lincare bill, Arrigo stated that he never received a "clean bill" from the provider.

■ Finding the testimony of Claimant's witnesses credible and the testimony of Arrigo credible as he lent support to Claimant's contentions, the WCJ granted the penalty petition finding that Claimant's home health care services were the responsibility of Employer/the Carrier, and the Carrier had all the information necessary to make the payments for Callahan's services except that the bills were not presented on the proper forms. The WCJ set forth his dissatisfaction with the Carrier in findings of fact 8, 9, 10 and 11 stating the following:

8. In making the above determination, it is observed that the specifics of the

home services have been given to the Carrier. Testimony from Mr. Arrigo, the claims representative, supports this, aside from Claimant's evidence. He conceded that as of the deposition testimony of Ms. Dunphy, the Employer's bookkeeper, on June 12, 2003, he has had all the information necessary, except for certain forms. Within the context of these claims, while the forms noted by Mr. Arrigo might otherwise be a defense, the defense fails here. First, by the time noted (and regardless of any earlier defect, if any), the Carrier was fully aware of the specifics as to Claimant's care—who had performed the work, the days, the hours, the functions. Moreover, as related to the aide services, they were in substantial accord with the Utilization Review, with the Claimant limiting the aide services to a maximum of 15 hours per week.

9. Further, and particularly significant, is the fact that claimant had undertaken to obtain home health care which Mr. Arrigo by his own admission acknowledged was the responsibility of the Carrier; the outside agency which the Carrier had retained to provide such services was unable to meet the needs of the Claimant due to its inability to have personnel available for some shifts, and Mr. Arrigo conceded Claimant continued to have the need for such services despite the inability of the agency to provide them. Further, the Carrier was aware that the Claimant was concerned about this, and was trying to correct the situation himself. The record reflects that Claimant's Counsel as early as January 8, 2002 advised Defense Counsel of this concern and asked the Carrier to act with dispatch. (See, Letter, C–2, Tab 12).

10. Here, there is no evidence that the Carrier in any meaningful way sought to meet its accepted responsibilities to the Claimant as to that portion of home care which its outside vendor (Personal Health Care) was unable to provide (due to inadequate staffing). While Mr. Arrigo noted the outside agency was seeking to cover all shifts, there is no indication on this record that the Carrier followed up with the agency, or treated Claimant's daily needs in that specific regard with any sense of haste or urgency as was clearly required given Claimant's condition and circumstance. Within this factual pattern, Claimant arranged for filling the periods the agency could not—he was required to do so. It was necessary. Given his physical condition, he could not "wait around" while the Carrier failed to act. And he did so at rates that were the same or lower than that paid by the Carrier for similar services.

11. The services were paid for by the Claimant (Seven Stars Farm)—Claimant is not a medical provider and he was essentially discharging the responsibility of the Carrier as to home health care. This circumstance excuses any more formal presentation of the claim for reimbursement. Moreover, this record establishes that the Carrier had made payment for home health care services in the past without the need for the forms now deemed so vital (See, Arrigo, NT 56–57). If otherwise deemed required, as positioned by Mr. Arrigo in his February 4, 2003 correspondence (coming on the threshold of the filing of a Penalty Petition) ... it is hard to understand what additional information the forms would have provided, given Mr. Arrigo's own testimony as to having all necessary information, particularly after the deposition of Ms. Dunphy. (See, Arrigo, NT 57–58). Yet, payment has not been made. The Act and Regulations require payment of medical bills

within 30 days of submission of the bills; that provision has been violated, and it is clear there has been undue delay. The WCJ went on to find that the Carrier was fully aware of the difficulties Claimant had regarding payment for prescriptions and for necessary medical supplies purchased from Gateway Pharmacy and Home Health Care Supply, and "the record supports belated efforts by the Carrier to remedy the situation, by having a separate company (Injured Workers Pharmacy) supply needed medication to the Claimant, and has made arrangements for direct billing with Home Health Care Supply, and has otherwise sought to resolve the issue as to these two vendors." (WCJ's July 6, 2005 Decision at 11.) The WCJ then assessed a 50% penalty on the outstanding $21,167.73 expenses and a $4,000 quantum meruit fee. Employer filed an appeal with the Board, which affirmed, and this appeal followed.[2]

■ Employer contends that the WCJ erred in ordering payment and assessing a penalty of 50% on charges for Callahan's services because the Carrier did not violate the Act by denying reimbursement of payments to Callahan. It explains that while it is the insurance carrier's burden to pay medical expenses related to a compensable injury pursuant to Section 306(f.1)(1) of the Act, 77 P.S. § 531(1),[3] under Section 306(f.1)(5) of the Act, 77 P.S. § 531(5),[4] it is the claimant's burden to supply the insurance carrier with any bills on the proper forms. Because Dunphy sent the Carrier lists of hours and charges for services performed by Callahan, but prior to the filing of the penalty petition she did not provide any time cards, time sheets, notes or description of the services provided, or payroll records from Employer to support the bills, and Dunphy did not present any bill on the proper Medicare-approved form (HCFA Forms) or forms prescribed by the Department of Labor and Industry, the Carrier properly refused to pay for Callahan's services.

Claimant responds by arguing that Employer's "technical" defense fails because the Carrier actually made a payment for Callahan's services from January 10, 2002, to February 23, 2003, even though the bills were not submitted on the proper forms. Therefore, the forms were not necessary for an actual payment to be made. Additionally, because some of the bills were paid by a third party, the bills did not need to be repriced because the third party was entitled to 100% reimbursement of the bills and were not subject to the medical cost containment provisions which require the filing of the HCFA Forms Arrigo referred to in his testimony.[5] We agree with Claimant.

**2.** Our scope of review of the Board's decision is limited to determining whether constitutional rights were violated, an error of law occurred, or whether necessary findings of fact were not supported by substantial evidence. *Morris v. Workers' Compensation Appeal Board (Walmart Stores, Inc.)*, 879 A.2d 869 (Pa.Cmwlth.2005).

**3.** 77 P.S. § 531(1) provides, in relevant part: (1)(i) The employer shall provide payment in accordance with this section for reasonable surgical and medical services, services rendered by physicians or other health care providers, ... medicines and supplies, as and when needed.

**4.** 77 P.S. § 531(5) provides, in relevant part:

The employer or insurer shall make payment and *providers shall submit bills and records in accordance with the provisions of this section.* (Emphasis added.)

**5.** *See e.g.,* 34 Pa.Code § 127.201. Medical bills-standard forms.

(a) Requests for payment of medical bills shall be made either on the HCFA Form 1500 or the UB92 form (HCFA Form 1450), or any successor forms, required by HCFA for submission of Medicare claims. If HCFA accepts a form for submission of Medicare claims by a certain provider, that

Not discussed by any of the parties is our recent decision in *Sims v. Workers' Compensation Appeal Board (School District of Philadelphia)*, 928 A.2d 363 (Pa. Cmwlth.2007), Pellegrini, J. dissenting. At issue in that case were a few bills, among them a bill for two pairs of orthopedic shoes that the claimant failed to submit on the proper form. The Court held that because the bill for the shoes was not presented on the proper HCFA form and not accompanied by the required provider's report, and Sims did not provide her employer with sufficient information to allow it to know that her bills were for treatment related to her work injury, the claimant did not meet her burden of proving that the medical invoice was related to her work injury. The majority did not address whether an employer was excused from penalties when in the past, it had accepted for payment bills not submitted on proper forms.

We did, however, address that issue in *Kuemmerle v. Workers' Compensation Appeal Board (Acme Markets, Inc.)*, 742 A.2d 229 (Pa.Cmwlth.1999), where we held that a provider's failure to submit required written reports to the insurance carrier did not excuse an employer from penalties for failure to pay bills because it did not require medical reports in all instances for payment of medical services. In this case, Carrier paid at least one of Claimant's bills for Callahan' services without the bill being submitted on the proper HCFA Form or Department of Labor form. The evidence was also clear that Claimant submitted all of the necessary information to Carrier in order for Callahan's bills to be paid. Consequently, *Sims* is distinguishable.

Accordingly, even though the bills were not submitted on the proper forms, the order of the Board is affirmed.

## ORDER

AND NOW, this *8th* day of *November,* 2007, the order of the Workers' Compensation Appeal Board dated April 30, 2007, at No. A05–1845, is affirmed.

---

form shall be acceptable for billing under the act.

(b) Cost-based providers shall submit a detailed bill including the service codes consistent with the service codes submitted to the Bureau on the detailed charge master in accordance with § 127.155(b) (relating to medical fee updates on and after January 1, 1995—outpatient acute care providers, specialty hospitals and other cost-reimbursed providers), or consistent with new service codes added under § 127.155(d) and (e).